1  **IN THE UNITED STATES DISTRICT COURT**
   **FOR**
2  **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6  THE UNITED STATES
      OF AMERICA
7                                          CRIMINAL ACTION NO.
        vs.                                1:07-Cr-60-MEF
8  JAMES ALLAN GIBSON

9

10

11

12

13            DIGITALLY FTR RECORDED,
          THEN TAKEN STENOGRAPHICALLY
14          AND TRANSCRIBED THEREAFTER

15

16            REVOCATION HEARING

17

18

19            *  *  *  *  *  *  *  *  *  *

20

21  HEARD BEFORE:     The Hon. Susan Russ Walker

22  HEARD AT:         Montgomery, Alabama

23  HEARD ON:         February 28, 2008

24  APPEARANCES:      Matthew Shepherd, Esq.

25                    Aylia McKee, Esq.

MITCHELL P. REISNER, CM, CRR
Official U. S. Court Reporter
Middle District of Alabama
(334) 265-2500

1

# **T A B L E   O F   C O N T E N T S**

2

3  <u>**ITEM DESCRIPTION**</u>                                     <u>**PAGE NO.**</u>

4
Table of Contents ........................    1

5

Title Page ...............................    2

6

Robert Pitcher - Direct Examination

7       by Mr. Shepherd ......................    3

8  Robert Pitcher - Cross Examination
        by Ms. McKee .........................   10

9

Robert Pitcher - Redirect Examination

10       by Mr. Shepherd ......................   23

11  Robert Pitcher - Recross Examination
        by Ms. McKee .........................   26

12

Bernard Ross - Direct Examination

13       by Mr. Shepherd ......................   27

14  Bernard Ross - Cross Examination
        by Ms. McKee .........................   34

15

Buddy Johns - Direct Examination

16       by Ms. McKee .........................   41

17  Johnny Johnson - Direct Examination
        by Ms. McKee .........................   45

18

Johnny Johnson - Cross Examination

19       by Mr. Shepherd ......................   47

20  Johnny Johnson - Redirect Examination
        by Ms. McKee .........................   48

21

22

23  Court Reporter's Certificate ...............   54
24

25                            -o0o-

| | |
|---|---|
| 1 | WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. SUSAN RUSS WALKER ON FEBRUARY 28, 2008 AT THE UNITED |
| 2 | STATES COURTHOUSE IN MONTGOMERY, ALABAMA: |
| 3 | |
| 4 | THE COURT:  *United States vs. James Allan Gibson*, |
| 5 | one oh seven C R sixty, and we're here for a bond revocation |
| 6 | hearing. |
| 7 | Everybody ready to proceed? |
| 8 | MR. SHEPHERD:  Yes, Your Honor. |
| 9 | MS. McKEE:  Yes, Your Honor. |
| 10 | I must apologize for my absence. |
| 11 | THE COURT:  I understood you were in another |
| 12 | proceeding. |
| 13 | MS. McKEE:  I was. |
| 14 | THE COURT:  Not much you can do about that. |
| 15 | Let's go forward.  I'll hear from the Government |
| 16 | first. |
| 17 | MR. SHEPHERD:  Your Honor, the Government calls |
| 18 | Robert Pitcher. |
| 19 | R O B E R T    P R I T C H E R, |
| 20 | the witness herein, having first been duly sworn or |
| 21 | affirmed to tell the truth, was examined and testified as |
| 22 | follows: |
| 23 | DIRECT EXAMINATION |
| 24 | BY MR. SHEPHERD ROBERT Pitcher: |
| 25 | Q.  Will you please state your full name. |

1    A.   Robert A. Pitcher.

2    Q.   And where do you work, sir?

3    A.   I'm the officer in charge of the U. S. Probation Office

4    in Dothan, Alabama.

5    Q.   And how long have you had that position?

6    A.   I had the officer-in-charge position since October two

7    thousand one.  I have been at the Dothan office since

8    February of nineteen ninety-one.

9    Q.   And, Officer Pitcher, did you have any involvement in the

10   supervision of a James Allan Gibson?

11   A.   Yes, sir.

12   Q.   Is that because he was on pretrial release on bond?

13   A.   Yes, sir.

14   Q.   Did you participate in conducting a drug test on February

15   fifth, two thousand eight of Mr. Gibson?

16   A.   Yes, sir, I did.

17   Q.   Before we talk about Mr. Gibson and that test

18   specifically, could you please describe the procedures you

19   follow when giving a urinalysis or drug test.

20   A.   Yes.  Normally we do what's called an "instant test".

21   It's a preliminary test.  We observe the urinalysis, the

22   person provides the sample, and we do what's called an

23   "instant test" to see if it shows positive or negative.  It's

24   a hand-held test.

25   Q.   And in collecting that sample, is there any paperwork to

```
 1   fill out to ensure that it is indeed the subject sample?
 2   A.  If the instant test shows what's called a presumptive
 3   positive test, the possibility of a positive, at that time we
 4   fill a form out and send it out for laboratory testing.
 5   Q.  Do you interview the person who gives the test as well,
 6   when a presumptive test occurs?
 7   A.  We discuss it with them.  We just inform them that it's
 8   showing a presumptive positive test at that time and that
 9   we're going to have to send it for laboratory analysis at
10   that time.
11   Q.  Now regarding the test of Mr. Gibson on February fifth,
12   could you please describe when Mr. Gibson came to your
13   office?
14   A.  Yes.  He reported in -- I believe he reports normally on
15   a weekly basis for a test.  So he came in.  The test was
16   conducted, and the instant test showed a presumptive positive
17   for cocaine.  The way to see it is a line comes across
18   showing a positive or negative.  A line showed on the
19   cocaine.  So at that time I informed Mr. Gibson it's
20   necessary to send it off for a laboratory analysis.  So I
21   informed him of that at that time.  So then I proceeded with
22   the paperwork at that time.
23   Q.  Now when you administered this test -- Well, excuse me.
24   When you took the sample, did you observe Mr. Gibson give the
25   sample?
```

1  A.  Yes, I did.

2  Q.  And was anybody else present during that time?

3  A.  Not during the giving of the sample.  It was just Mr.

4  Gibson and myself.

5  Q.  Now when handling the sample, or the container of the

6  sample, do you take any precautions?

7  A.  When we initially get the container it shows -- there's a

8  little stripe that shows whether it's sealed or not, and I

9  always just check to make sure the seal is there and it's

10  tight before I hand it to the individual that we're testing.

11  And I did that in this case.

12  Q.  And do you ever reuse those jars or those bottles?

13  A.  No.

14  Q.  Do you wear any type of rubber gloves, or gloves when

15  handling the sample?

16  A.  Yes.  We wear latex gloves, yes, sir.

17  Q.  And did you wear gloves in this case with Mr. Gibson's

18  sample?

19  A.  Yes, I did.

20  Q.  When the test came up to be presumptively positive in

21  this case, what did you do after that?

22  A.  I informed Mr. Gibson that it was going to be necessary

23  to -- for it to be sent to the laboratory for testing.  We

24  discussed that.  We had a discussion about that, and then I

25  proceeded and went -- and proceeded to fill the paperwork out

1   and actually transferred it to the bottle that would be sent
2   to the lab and sealed the bottle.
3   Q.  In the sample that's sent to the lab, is there any type
4   of number codings or bar coding that's used to distinguish
5   that as that sample?
6   A.  Yes.
7   Q.  And if you could, please, describe what is the method in
8   which you send this to the lab.
9   A.  Well, we do is we take the test in the bottle provided.
10  We open a plastic kit that's provided by the laboratory and
11  transfer that sample to that bottle.  We screw the top back
12  on that, and then take the testing form that we fill out that
13  would have my name, his name and other various information
14  such as numbers and stuff on that.  Fill that out, and then I
15  remove a bar code from the form and place it over the
16  container, which would be a matching -- there are matching
17  numbers on the bar code.
18  Q.  Is that what was done in this case with Mr. Gibson's
19  sample?
20  A.  Yes, sir.
21          MR. SHEPHERD:  Your Honor, may I approach the
22  witness?
23          THE COURT:  You may.
24  Q.  Officer Pitcher, what I did just hand you?
25  A.  It's a chain of custody drug analysis federal probation

1  services form.

2  Q.  And that is Government's exhibit one for identification I

3  just handed you.

4        How do you recognize this form?

5  A.  It has a specimen number.  It has my name on it, and Mr.

6  Gibson's name on it and our signatures, and the date and a

7  few other things.  A few other various numbers on it.

8  Q.  And is this the form that you filled out on February

9  fifth regarding the defendant, James Gibson?

10 A.  It's a copy of the form, yes, sir.

11 Q.  And looking at this copy, does this appear to be an

12 accurate copy of the form that you filled out?

13 A.  Yes, sir, it does.

14 Q.  And the signatures on the form, are those your signatures

15 in two places?

16 A.  Yes, sir, they are my signature.

17 Q.  And there's a place for "offender certification"?

18 A.  Yes, sir.

19 Q.  Who signed in that block?

20 A.  Mr. Gibson signed the block on the left where it says

21 "offender defendant's certification".  It has his

22 signature.

23 Q.  And did you witness that signature of his?

24 A.  Yes, sir.

25        MR. SHEPHERD:  Your Honor, the Government moves to

1    admit exhibit one at this time.

2            THE COURT:  Any objection?

3            MS. McKEE:  No objection.

4            THE COURT:  It's admitted.

5    Q.  In looking at this form, the block that says "offender

6    defendant'S certification," what's the purpose of that block

7    and that signature line?

8    A.  The purpose of that is did we seal the bottle and allow

9    the offender to observe the bottle that is sealed.  He can

10   identify the numbers, and can also identify that we have

11   sealed the bottle.  He can identify the specimen numbers --

12   Q.  And --

13   A.  -- prior to us sending it out.

14   Q.  And when Mr. Gibson signed this form, did he indicate any

15   objections to the procedures?

16   A.  Mr. Gibson was upset and vocal, and Mr. Johns, they were

17   also discussing it.  He was upset it tested positive.  Mr.

18   Johns was trying to explain to him, both of us were trying to

19   explain to him, why this was necessary for what we were

20   doing, and he was just really upset.

21           So when I told him, I said, "Mr. Gibson, you have

22   to sign this," he was pretty emotional, pretty upset.  So he

23   just quickly signed that, and at that time just left the

24   office.

25   Q.  Now at any time did Mr. Gibson request to give another

1    sample?

2    A.  Yes, sir.

3    Q.  And did you permit that to happen?

4    A.  No, sir.

5    Q.  And why not?

6    A.  Well, Mr. Gibson initially mentioned it right after the

7    presumptive.  I told him that normal procedure and policy of

8    the office was we have to send this test off.  The

9    presumptive positive does not necessarily show a positive.

10   We need to send this off so we can verify that it's a

11   positive finding, and I was trying to explain that to him.

12           He was wanting to say, "I want to come back later,

13   give another sample."  And we discussed that and told him

14   that was not normal procedure, that I had to send this one

15   off.  I told him we were not going to take another sample at

16   that time.

17   Q.  And, Officer Pitcher, the sample that you sent off, was

18   that the same urine that you saw the defendant provide to you

19   earlier?

20   A.  Yes, sir.

21           MR. SHEPHERD:  Your Honor, the Government has no

22   further questions at this time for this witness.

23           THE COURT:  All right.  Cross examination?

24                      CROSS EXAMINATION

25                 BY MS. McKEE OF ROBERT Pitcher:

1  Q.  Mr. Pitcher, you said that it was a policy in the office

2  that you would send the first sample that you obtained off to

3  the lab.

4  A.  If it shows a presumptive positive we do.  If all the

5  initial tests shows a negative, we do not send it to a lab.

6  It's considered a negative test.  If it shows a presumptive

7  positive, at that time our policy is that we send it off for

8  what's called a confirmation test to see if it is actually a

9  positive and meets the standards.

10 Q.  But there was nothing at the time -- You testified that

11 immediately after informing Mr. Gibson that he had a

12 presumptive positive test, you said he had requested that

13 another test be given -- or administered to him at that time,

14 correct?

15 A.  It was a discussion.  You know, he brought it up.  "I

16 want to do another test."  I told him that, "You provided a

17 sample, and we need to send this off for a confirmation test.

18 We don't want to do another test.  Now we haven't even fully

19 tested this sample."

20        And so I was just trying to explain to him that's

21 our normal policy, normal procedures.  And he was upset and

22 pretty vocal at that time.

23 Q.  Would you agree that it was your understanding of his

24 point in asking for another test, that he wanted to try to

25 show you all that it was -- or his assertion that it should

1    be negative?  Was that your understanding?

2    A.  I suppose so.  You know, he was very emoted, and I had a

3    difficult time.  I would try to start explaining it to him,

4    but I don't think he was really listening.  He would say, "I

5    want another test.  This can't be."  You know, and various

6    things like that.

7            And that would just be an assumption on my part,

8    that it would be negative or -- He was just really upset.

9    Q.  When you say he was really upset, he didn't curse at all

10   while he was in the office, did he?

11   A.  He didn't curse at me, no.

12   Q.  You say he didn't curse at you.  Did he curse at anyone

13   in the office?

14   A.  Not that I know of.  But, I mean, he didn't direct

15   anything toward me, and I didn't observe him cursing at

16   anyone directly in the office that day, no.

17   Q.  Did Mr. Gibson -- He never raised his voice when he was

18   in there?

19   A.  Yes, he raised his voice.  And he was very emoted, so he

20   raised his voice and demanding another test.  In fact, if you

21   don't mind me going on, it was actually two instances when we

22   he gave the test and he came back later.  So we're talking

23   about two different times.

24   Q.  And I will get into that, the second time he came back.

25   A.  Okay.

1    Q.  But when you say that he was -- and you described his

2    behavior as being "really upset," that period of time when

3    you described him as being "really upset," that is

4    constrained to the exact period of time when Mr. Gibson was

5    merely asking, or more or less pleading, for another test.

6    A.  After I told him it was a presumptive positive showing

7    up, he said, "I want another test.  I want to come back later

8    and do another test."

9            And I said, "That's just not our policy."

10           So when we discussed this he said, "No, I haven't

11   used any cocaine."  And that was our discussion.  Then I had

12   to go back and start the paperwork.

13   Q.  And he complied with you with regard to the paperwork, as

14   we've already seen he signed the form?

15   A.  He did, yes.  When I tried to verify the numbers, he and

16   Mr. Johns -- Mr. Johns had started -- Like I say, he was very

17   emotive, very directive, and Mr. Johns was trying also,

18   because he knows him, was trying to explain why we were doing

19   this and what our policy was.  And they were in a discussion

20   behind me.  And then when I was trying to show him that, he

21   just basically signed the form and left.

22   Q.  But that's all that was required of him with regard do

23   that form, correct?

24   A.  Yeah.  I wish he had taken the time to supposedly do a

25   more careful verification of the numbers.  He just signed it

1   and left.  And I would have liked to have been able to sit

2   there and talk to him a little calmly, but he was upset, so

3   he just left.

4   Q.  But before he left, he informed yourself, as well as Mr.

5   Johns, that he was going to take another test, correct?

6   A.  He said something about that.  I believe he was talking

7   to Mr. Johns.  I heard him say something about --

8              (Two speaking at once; unintelligible.)

9              -- or something like this.  And that was all.  He

10  and I did not discuss that at length.

11  Q.  And, Mr. Pitcher, this was the first time you had ever

12  administered a test to Mr. Gibson, correct?

13  A.  I may have administered one earlier.  He comes in the

14  office weekly, so I could have possibly administered one of

15  the others.  It's the first positive test.  I believe I

16  actually administered another one prior to that.

17  Q.  You had talked about a time before Mr. Gibson left your

18  office that day, and he came back to your office?

19  A.  Yes, ma'am, he did.

20  Q.  And he came back to your office with the results of

21  another test.  Isn't that correct?

22  A.  He had called and I answered the phone, and he wanted

23  another test.  And I said, "Mr. Gibson, we're not going to do

24  another test today.  We've got to get these results.  I've

25  got to discuss that with the actual supervising officer, Mr.

1    Ross."

2              And so he wanted to come to the office, and I told

3    him he could come to the office and he came in.  But I never

4    looked at -- He showed that to Mr. Johns.  I never actually

5    looked at that.  Mr. Johns did, but I did not.

6    Q.  How do you get into the office in Dothan where you're

7    located?  Not the actual front door from the outside, but if

8    I am in there in the front room and tried to get back to

9    where like, for instance, your office is, would I need to be

10   buzzed back through, or --

11   A.  An officer could open the door and buzz you through.

12   Q.  But a regular citizen, someone that did not work there,

13   could not have access?

14   A.  No.  They could come through the front door, but not

15   actually into the office complex itself.

16   Q.  And you say that he called your office first and told you

17   that he had the results from another test.

18   A.  He did.

19   Q.  And you said that you were not going to administer him

20   another test.

21   A.  That's exactly right, yes.

22   Q.  But you say you told him to come back to your office

23   anyway?

24   A.  No.  He said, "I wanted to come back here."

25              I said, "You can come to the office, but we're not

1    going to do another test."  I mean he can come to the office,

2    but I told him at that time that, you know, I was not going

3    to take and administer another test today.

4    Q.  Well, Mr. Pitcher, help me understand why, if you were

5    not going to administer another test to Mr. Gibson and you

6    say that he was already, in your words, "really upset" the

7    first time, why would you tell him to come back if you

8    weren't going to give him the test?

9    A.  He told me he was very close by and wanted to come by the

10   office.  I didn't have any objections to him coming to the

11   office.  He said he was very close by, a few minutes away or

12   something along those lines.  I don't recall the conversation

13   exactly.  And I said, "You can come to the office."  I mean

14   he was nearby and he acted like he wanted to discuss this.

15              I said, "You can come to the office," but I was

16   clear that we're not going to administer another test that

17   day.

18   Q.  And Mr. Johns is actually the individual that let Mr.

19   Gibson into the office that day when he came back?

20   A.  Yes.  The second time, yes, that would be correct, yes.

21   Q.  And when he got into your office that second time that

22   day, he again asked for another test from you?

23   A.  Oh, yes.  Yes.

24   Q.  And at this point he had in his hand a drug screening

25   with a negative result that he had just given the same day,

1   correct?

2   A.  He showed that to Mr. Johns.  I actually did not observe

3   it.  Mr. Johns observed that, so I understand he did.  I

4   don't want to testify that I actually reviewed the thing,

5   because I did not, but I understand he did.

6   Q.  And, again, Mr. Gibson was denied another test?

7   A.  Yes.  Yes, he was.

8   Q.  So you testified earlier that you were going through the

9   procedures of when you do a drug screen.  You said there's a

10   point where you have the individual like Mr. Gibson give the

11   specimen in a cup, correct?

12   A.  Yes.

13   Q.  And you said if there's a presumptive positive, then you

14   transfer the specimen out of that cup to another cup.  I

15   guess you described it as a "lab kit"?

16   A.  Yes, that would be generally accurate.  Yes.

17   Q.  So what do you do with that first cup that an individual

18   like Mr. Gibson would have actually put the specimen directly

19   into?  What do you do with that cup?

20   A.  The first one, we throw it away.  It's thrown away.

21   Q.  Would there be any reason to have any of these cups

22   around the office that are not sealed?

23   A.  That would just be sitting around the office and are not

24   sealed?

25   Q.  They could be in a desk drawer, they could be sitting on

```
 1   top of a desk piled on each other.  But my question is, would
 2   there be any reason for a cup that's going to be used for
 3   drug screen specimens, is there any reason for that cup to be
 4   unsealed at any pint when it's just in the office?
 5   A.  No.  The officers have sealed cups.  The officers are
 6   going in and out of the field at various times, so they carry
 7   cups with them.  So there could be cups laying on the desk
 8   that are sealed that they're taking in.  There could be a cup
 9   that an officer has used.
10          I'm not exactly sure what your question is, but it
11   wouldn't be -- They're not normally sitting around the office
12   all over, no.
13          THE COURT:  Let me make sure I understand and maybe
14   to speed this up.  Is the defendant's theory that a used cup
15   was then again used for him?
16          MS. McKEE:  Potentially, yes, Your Honor.
17          THE COURT:  Okay.  And so you're challenging the
18   validity of the test.
19          MS. McKEE:  Yes.
20          THE COURT:  Okay.  Go ahead.
21   Q.  Mr. Pitcher, how do the cups arrive at the office?
22   A.  We usually get -- They come into the Montgomery office.
23   They come into the Montgomery office, and so we -- the cups
24   come in like a big bag, and they're usually picked up by one
25   of our officers, or Mr. Ross might bring it.  So they're
```

1    brought from the Montgomery office to our office in a big

2    plastic container.

3    Q.  If someone stated that a cup that they received for a

4    specimen was not sealed, what reason would -- would there be

5    a reason why the cup would not have been sealed when it was

6    given to an individual?

7    A.  Not that -- The normal procedure would be when you take

8    the cup out of the drawer as I did in this instance, you

9    check to see if the seal is intact.  I always check the top

10    to make sure it's screwed on.  That's what I do.  I can't

11    speak to any other test other than what I do.

12    Q.  Well let me ask you, when you say "sealed," are you

13    speaking of an actual sealant, like some plastic over the

14    cup, or are you speaking simply of a plastic cup with a screw

15    top?

16    A.  There is a plastic cup that has a paper like seal that

17    comes across the cup.  If I don't have one and it matches,

18    and you can observe that and see that the seal there has been

19    broken.  I usually -- What I did in this instance --

20         THE COURT:  I was going to say, just tell me what

21    you did in this instance.

22    A.  Okay.  What I did in this incident is the seal was there.

23    In addition, I will check to make sure the top is down tight

24    and check --

25         THE COURT:  You're saying you did that this time?

```
1              THE WITNESS:  I did that in this incident.  And I
2     normally do that as a procedure, and I did it in this
3     incident, yes, ma'am.
4     Q.  So you're saying in this particular case when you
5     originally gave Mr. Gibson his drug screen, you gave him a
6     cup that you had already apparently outside of his presence
7     broken the seal on.
8     A.  Not outside of his presence.  He was standing, you know,
9     from here to there.  He had come down the hallway.  I
10    observed it.  I checked it to make sure if the seal and lip
11    was tight, and then I handed it to him.  That's what I did.
12    Q.  Were you taking care to make sure that the individual
13    that's giving the specimen actually sees the seal being
14    broken, since it is their specimen that's going into the
15    cup?
16    A.  Sometimes I do.  In this incident I checked the seal.  I
17    mean, I want to satisfy that I did it.  I did not say
18    anything to him.  If you're asking me did I show it to him,
19    no, ma'am, I do not do that.  I mean, I observed it myself.
20    Q.  Well if it's not significant to allow an individual to
21    see the sealed cup before they give the specimen, why is it
22    significant to allow them to see the numbers, to make sure
23    the numbers match up on Government's exhibit one?
24    A.  Because we're actually placing -- I'm placing the seal
25    over it at that time and showing them that I have sealed the
```

1    specimen.  So that's the reason we do that.  The original cup

2    has no numbers on it or anything like that.

3    Q.  But an average person looking at it would still be able

4    to tell that it's sealed, or that that seal has been broken.

5    A.  Yes, that would be true.

6              MS. McKEE:  May I have just a minute?

7              THE COURT:  You may.

8    Q.  Mr. Pitcher, what is the procedure in your office, or do

9    you have a procedure in your office, if a test -- if you have

10   like a false positive?

11   A.  I'm not sure what you mean by "false positive".

12   Q.  A test that when you test it, it comes back positive, but

13   somehow it is indicated that either by an error or

14   malfunction of the test or whatever reason, it's a false

15   positive; which means, the person is actually clean of

16   narcotics, does not have any of that type of substance in

17   their system but the test may say that they do.

18   A.  Are you talking about the instant test or the one that's

19   sent to the laboratory?

20   Q.  Either one.

21   A.  The presumptive test, the reason we send the presumptive

22   test is for it to be confirmed.  If it confirmed by the lab

23   and it says it's positive, and I'm not sure what you're

24   asking, if it's a confirmed positive -- I mean, I don't know

25   what you're asking.  Unless I'm not understanding your

1  question by a "false positive," I don't --

2  Q.  Well, let me ask you, has there ever been an instance

3  where you have had a positive presumptive test that has been

4  sent off to be confirmed, and when you received the report

5  back it was not confirmed as positive?

6  A.  There has been incidents -- And, you know, I don't take a

7  lot of tests as -- as my supervision officers, so I can test

8  generally as a supervisor of the office.  I've seen that

9  happen where it's shown a presumptive positive, it gets sent

10  off and it appears to be a negative.  I know that happens.  I

11  couldn't recall specific cases for you, but I do know it

12  happens.

13  Q.  Okay.  What I'm asking you is what is the procedure in

14  your office once you realize that there has been a false

15  positive?

16  A.  If we send a test off to the laboratory and it shows as a

17  presumptive positive and then we send it off and it comes

18  back negative from the lab, it's a negative test.

19  Q.  At any point was Mr. Gibson ever allowed to take a drug

20  test, as he had requested, twice after the presumptive

21  positive?

22  A.  Not to my knowledge.  I never did that.  Now I can't, you

23  know -- I can't testify to anything else, but not from me,

24  no.  I can't testify to anything other than myself.

25  Q.  And just one last thing.  Is it generally that the

1    individuals that come in, where is the specimen actually

2    given?  You said you were there when Mr. Gibson gave his

3    test.

4    A.  We have a restroom at the United States Probation Office.

5    They enter the restroom, and I enter behind him and observe

6    the test.

7    Q.  So they are already in the restroom and you bring the cup

8    into the restroom with them?

9    A.  I can testify -- You want me to just testify as to what I

10   did in this case?

11   Q.  Yeah.

12   A.  Mr. Gibson is in the hallway.  We were generally talking

13   when I checked on Mr. Gibson.  Mr. Gibson comes there weekly

14   so he knows what it is, and I followed him.  He walks in

15   there and I followed him in.

16           MS. McKEE:  No further questions, Your Honor.

17           THE COURT:  All right.  Redirect?

18           MR. SHEPHERD:  Yes, ma'am.

19                   REDIRECT EXAMINATION

20               BY MR. SHEPHERD OF ROBERT PITCHER:

21   Q.  Officer Pitcher, in this case did you add anything to the

22   urine sample?

23   A.  No, sir.

24   Q.  Did anyone else have access to it besides you?

25   A.  No.

1  Q.  And from the time in which it was -- you sealed it up to

2  mail it to the lab, how long was it before it actually went

3  in the mail to the lab?

4  A.  I probably mailed it roughly when we closed the office

5  shortly after Mr. Gibson left.  The second time I would say

6  roughly five-fifteen or five-thirty that day.  Somewhere in

7  that general time frame.  It was mailed the same day.

8  Q.  Is there anything that you did in this case that was

9  different from every other urine test that you performed in

10  your career?

11  A.  No, sir.  The same procedures.

12  Q.  And to your knowledge, have you ever been aware of any

13  instances where the sealed cups themselves were determined

14  later to have been contaminated?

15  A.  No, sir, not to my knowledge.

16  Q.  And finally, you said you didn't actually see the test

17  result that Mr. Gibson brought to your office later that same

18  day, that he showed it to Mr. Johns, is that right?

19  A.  That's correct.  I never actually observed it and looked

20  at it.

21  Q.  Did Mr. Johns explain to you what was on that test

22  result?

23  A.  He did.

24  Q.  And what did he tell you?

25  A.  He told me that at the bottom it had some diluted sample,

1   or something to that effect.  He said apparently the sample

2   said it was diluted, and we discussed that.  But I actually

3   never saw it.

4   Q.  And finally, is there a reason why when a supervising

5   officer demands you to take a test, that you don't allow him

6   to take a test?

7   A.  Yes.  The normal procedure is we obtain a drug test and,

8   you know, if we allowed offenders to come in and one we would

9   have to do it for everybody, we control the drug testing,

10  someone takes a drug test, we take it and we either have a

11  presumptive and then we send it out for a confirm, we don't

12  turn around and immediately do a test normally.  I don't do

13  that, and generally in our office we don't generally do that.

14  It would have to be some reason that I can't even think of

15  why we would.

16  Q.  And finally, who did the test results in this case from

17  the laboratory come back to?

18  A.  They went to Montgomery, Mr. Ross, because he's the

19  actual supervising officer.

20          MR. SHEPHERD:  Nothing further, Your Honor.

21          THE COURT:  All right.  You may step down.  Thank

22  you.

23          MS. McKEE:  Your Honor, if I could ask some very

24  brief questions.

25          THE COURT:  Very brief.  I want to talk to y'all

1    about time also, but go ahead.

2                    RECROSS EXAMINATION

3             BY MS. McKEE OF ROBERT PITCHER:

4    Q.  Sir, how much of a specimen was Mr. Gibson able to give

5    you?  It was only a very small amount that day, wasn't it?

6    A.  I would say it was probably less than maybe a half a

7    bottle of the normal size bottle.  To the best of my memory

8    -- I'm just going by memory -- I would say it was less than

9    half the glass.

10         MS. McKEE:  That's all.

11         THE COURT:  Okay.  You may step down now.

12         (Whereupon the witness, Robert Pitcher, stepped

13    down from the stand.)

14         THE COURT:  Let me just ask the Government, how

15    many witnesses do you have?

16         MR. SHEPHERD:  I have only Mr. Ross left.

17         THE COURT:  Okay.  And for the defendant?

18         MS. McKEE:  One very, very short witness, and

19    that's probably it.

20         THE COURT:  Okay.  There's a need for me to sign a

21    search warrant after this and that's why I asked the

22    question.

23         Go ahead and call Mr. Ross.

24         MR. SHEPHERD:  Yes, Your Honor.  Bernard Ross,

25    please.

1          B E R N A R D      R O S S,

2      the witness herein, having first been duly sworn or

3   affirmed to tell the truth, was examined and testified as

4   follows:

5                         DIRECT EXAMINATION

6                   BY MR. SHEPHERD OF BERNARD ROSS:

7   Q.   Would you please state your full name.

8   A.   Willie Bernard Ross, Junior.

9   Q.   And where are you employed?

10  A.   United States Probation Office.

11  Q.   How long have you been a probation officer?

12  A.   Since March third, nineteen ninety-three.

13  Q.   And you supervise defendants on pretrial release?

14  A.   Yes, sir.

15  Q.   And are you supervising a James Allan Gibson?

16  A.   Yes.

17  Q.   Officer Ross, are you aware of a urine test that Mr.

18  Gibson took on February fifth, two thousand eight?

19  A.   Yes, sir.

20  Q.   And did you receive the results from the laboratory of

21  the testing done on the sample he gave that day?

22  A.   Yes, sir.

23  Q.   And what were the results that the laboratory reported to

24  you?

25  A.   Confirmed positive results for cocaine.

1          MR. SHEPHERD:  Your Honor, may I approach the

2    witness?

3          THE COURT:  You may.

4    Q.  Officer Ross, I just showed you Government's exhibit two

5    for identification.  What is that?

6    A.  That's the laboratory results that is faxed to our

7    office.

8    Q.  And looking at this result.  Does this appear to be the

9    full report that was sent to your office?

10   A.  Yes, sir.

11         MR. SHEPHERD:  Your Honor, the Government moves to

12   admit exhibit two at this time.

13         THE COURT:  Any objection?

14         MS. McKEE:  No objection.

15         THE COURT:  It's admitted.

16   Q.  Now, Officer Ross, taking a look at Government's exhibit

17   two, if you look in the middle of the page there's a line

18   that says "specimen I D".  Do you see that line that's below

19   "results of controlled substance"?  It's about three lines

20   below that.

21   A.  Yes.

22   Q.  Okay.  There's a number beside that.  What is that

23   number?

24   A.  Specimen I D number?

25   Q.  That's right.

```
 1   A.  C zero zero one two six seven three three.

 2           MR. SHEPHERD:  Your Honor, may I approach again?

 3           THE COURT:  You may.

 4   Q.  Officer Ross, I just handed you Government's exhibit one.

 5   What is the specimen number listed on Government's exhibit

 6   one?

 7   A.  Specimen number C zero zero one two six seven three

 8   three.

 9   Q.  And is that the same number you just read on the

10   laboratory results?

11   A.  Yes, sir.

12   Q.  The petition you filed with the Court also indicates a

13   violation for a failure to follow the instructions of the

14   probation officer.  Is that correct?

15   A.  Yes, sir.

16   Q.  And what were the instructions that you gave Mr. Gibson

17   regarding drug use?

18   A.  To refrain from illegal drug use.

19   Q.  And did you give that to him personally?

20   A.  Yes, sir.

21   Q.  And what were the instructions regarding associating with

22   people in criminal activity?

23   A.  To refrain from associating with persons engaged in

24   criminal activity.

25   Q.  And you stated in your report that he failed to follow
```

1    these instructions.  Could you please explain that to the

2    Court.

3    A.  Yes, sir.  He tested positive for cocaine; he had to

4    possess the cocaine, so he did not refrain from illegal drug

5    use there.

6                And refrain from associating with individuals

7    engaged in criminal activity, Mr. Gibson was on home

8    incarceration.  For him to possess or receive that illegal

9    drug he would have to be given the drug, unless he was able

10   to find some at his house.

11   Q.  And you stated a minute ago that Mr. Gibson was on home

12   confinement.  What were the conditions of his home

13   confinement?

14   A.  Mr. Gibson was on the home incarceration component of

15   home confinement; meaning, that he was confined to his

16   residence.  He was not allowed to leave the house for

17   employment or extracurricular activities.

18   Q.  Was he allowed to leave the house at all?

19   A.  No, sir.

20   Q.  Was he able to gain permission from you to leave the

21   house?

22   A.  Yes, sir.  Actually, Mr. Gibson's mother recently passed.

23   He was given permission by the Court to have visitation with

24   his mother.  But all visitation would have to be cleared

25   through the Court, considering his level of supervision.

1  Q.  Are you aware of whether on February fifth two thousand

2  eight Mr. Gibson left his house?

3  A.  Yes, sir.

4  Q.  And how do you know that?

5  A.  Mr. Gibson was wearing a transmitter on his ankle at the

6  time, and when he left out of range it noted a leave without

7  permission on that date.

8  Q.  And did you discuss that with Mr. Gibson at all?

9  A.  I did not discuss that with Mr. Gibson.  Mr. Gibson

10  actually returned to the residence.  I forget the exact time,

11  but it was shortly thereafter.  So no, I did not discuss it

12  with him personally.  He did, however, leave a message on my

13  voice mail saying where he was going.

14  Q.  According to the terms of his release, is leaving a

15  message on the voice mail sufficient for him to leave his

16  house?

17  A.  No, sir.

18  Q.  Are you aware of whether any other probation officers

19  gave him permission to leave his house?

20  A.  No, sir, I'm not aware of any.

21  Q.  Is there a procedure for contacting you or another

22  probation officer during either an emergency on non-duty

23  hours?

24  A.  Correct.  Mr. Gibson was given information on what to do

25  in case of life threatening emergencies at the start of his

1    electronic monitoring.  It was also reviewed again with him

2    when he was placed back on electronic monitoring.  In case of

3    a situation like that, Mr. Gibson was explained on what to

4    do, but the situation would have to be a life threatening

5    type situation.  Someone going to the emergency room, or what

6    have you.

7    Q.  And finally, if he was going to an outside laboratory to

8    get his urine test, what procedure would he be required to

9    follow before leaving his house to do that?

10    A.  Mr. Gibson would be -- is supposed to contact myself for

11    permission, and he wouldn't have been given permission had he

12    talked with me.

13    Q.  But did you grant permission in this case prior to him

14    leaving?

15    A.  No, sir.

16    Q.  If he were going to his Probation Office in Dothan and

17    just made a detour on the way home to a laboratory, would

18    that be considered by you having done a violation of the

19    terms of his home detention?

20    A.  Yes, sir, it would, because he was instructed to leave

21    from his residence going to the Dothan office to give a urine

22    screen and return back to his residence.  Mr. Gibson has done

23    this numerous times, as far as this procedure for the urine

24    screen, and to my knowledge it had not deviated.

25             MR. SHEPHERD:  Your Honor, the Government has no

1  further questions regarding the violations in this case.  We

2  would ask, I guess, that the Court be permitted to hear from

3  him if you do find him guilty of the violations regarding his

4  history on supervision, or --

5           THE COURT:  From Mr. Ross?

6           MR. SHEPHERD:  From Mr. Ross, yes.

7           THE COURT:  Well, his history -- Let me just tell

8  you that I recall his history fairly well, and Mr. Ross can

9  confirm it.  There was a positive drug screen initially when

10  he was placed on release.

11           MR. SHEPHERD:  Yes, Your Honor.

12           THE COURT:  He was ultimately sent to Fellowship

13  House in Birmingham for treatment.  And Mr. Ross, I guess I

14  can ask you, is that correct?

15           THE WITNESS:  That's correct, Your Honor.

16           THE COURT:  All right.  And this will just shorten

17  things a little bit.

18               There was a problem at Fellowship House, a

19  drug test that was refused?  Maybe can you describe what

20  happened then.  Refresh my memory.

21           THE WITNESS:  Well Mr. Gibson was awakened to give

22  a urine screen there at the Fellowship House.  Mr. Gibson

23  said that when he awakened he went to use the bathroom, then

24  went to give the urine screen but was unable to void.  He

25  requested permission to wait until he was capable of giving a

1  urine screen.

2          I think their policy at the Fellowship House was

3  not to wait.  Mr. Gibson was terminated for not submitting a

4  urine screen at that point.

5          THE COURT:  And then he came back before me for a

6  hearing of this kind?

7          MR. SHEPHERD:  That's correct, Your Honor.

8          THE COURT:  And I let him back out on electronic

9  monitoring after I think expressing the view that I wasn't

10  persuaded he hadn't used drugs, but given the way the

11  violation was charged and what the evidence was, I let him

12  back out on electronic monitoring.  And that brought us up to

13  date, unless you have some other history.

14          MR. SHEPHERD:  No, that's the only history I would

15  have asked Mr. Ross about.  But since it's not directly

16  relevant to the actual violation in this case --

17          THE COURT:  Well, it's the context in which I

18  consider all of this.  It is not the violation before me

19  today.

20          MR. SHEPHERD:  Yes, Your Honor.  I have no further

21  questions, no, ma'am.

22          THE COURT:  Cross examination?

23                    CROSS EXAMINATION

24              BY MS. McKEE OF BERNARD ROSS:

25  Q.  I'm sorry, Mr. Ross, I didn't hear your -- one of your

1    last answers.  You said you would or you would not, that Mr.

2    Gibson would or would not have gotten permission if he had

3    actually gotten into contact with you?

4    A.  I would have given him permission.

5         THE COURT:  I need to ask something else while you

6    do that, and then I'll let you follow up.

7         MS. McKEE:  Yes.

8         THE COURT:  There was testimony previously about a

9    sample that he got on his own that was said to be diluted.

10   Do you know anything about that?  And what does that mean?

11        THE WITNESS:  Yes, Your Honor.  The sample that Mr.

12   Gibson had gone to get subsequent after the urine screen that

13   he gave at the office on February fifth, I'm not exactly sure

14   where he went to get the sample, but through the report that

15   he showed the officer there in Dothan, at the bottom of the

16   report it showed to be a diluted sample.  He did not leave a

17   copy of the report with the officer, but in later talking

18   with Attorney Freeman, she stated that the sample was -- the

19   report was not left with the officer there but it was shown

20   to be a diluted sample.

21        THE COURT:  What does "diluted sample" mean to you?

22        THE WITNESS:  In my experience, Your Honor, a

23   "diluted sample" means that the person has overhydrated

24   themselves, or has drank a lot of water in an attempt to

25   dilute the urine that's being tested.  In a sample that's

1  being tested by a company, they actually test the urine

2  inside the sample.  Well if there's not a lot of urine but a

3  lot of water, then it's considered to be diluted.

4         THE COURT:  Is that considered a positive test?

5         THE WITNESS:  No, Your Honor, it's considered a

6  diluted test.

7         THE COURT:  I thought I heard at one point a

8  question about a positive test.  Let me let you follow up.

9  Q.  And with regard to that testing, a test that's diluted,

10  it still can test -- or give you a result for positive or

11  negative in the case of drugs that are found within that

12  diluted sample, correct?

13  A.  Well, yes, with an explanation.

14  Q.  Okay.  Well let me ask you, this the sample that you just

15  informed the Court about where Ms. Freeman was telling you it

16  was diluted --

17  A.  Yes, ma'am?

18  Q.  Did Ms. Freeman also informed you whether or not that

19  test, this had a positive or negative result?

20  A.  No, ma'am.

21  Q.  At any point did Mr. Pitcher or Mr. Johns explain to you

22  with regard to the fact that Mr. Gibson, coming back to the

23  office and showing them a report that said it was negative,

24  did either of them inform you of that?

25  A.  They did.  Well they informed me that the report was a

1    diluted, but I did not ask and they did not say whether or

2    not the results were negative.

3    Q.   So what is the actual -- You say the protocol is that Mr.

4    Gibson had to get permission with regard to violation number

5    three.

6    A.   Correct.

7    Q.   Mr. Gibson had to get permission from yourself or another

8    probation officer, correct?

9    A.   Correct.  Or if I'm not available, in my particular

10   status as electronic monitoring officer, I'm in the field a

11   lot, so if you're not able -- if the offender is not able to

12   contact myself, then they're able to contact my clerk.  Or if

13   they're not -- if that's unsatisfactory, then they can

14   contact another officer.

15         What would happen then is that that officer would

16   -- if needed, that officer would contact me.

17   Q.   In a situation where they couldn't reach you but they got

18   ahold of your clerk, what is your clerk supposed to do in

19   that situation?

20   A.   My clerk would probably call me on my cell phone.

21   Q.   Has there ever been -- Well let me ask you, do the people

22   in your office, are they as clear to the understanding of who

23   has authority to give individuals like Mr. Gibson permission

24   to leave home?

25   A.   From my experience, the people in my office don't like to

1   get involved with the electronic monitoring personnel.  They

2   will refer everything back to myself, which is why we all

3   carry cell phones and are able to contact each other.

4   Q.  And on this day you had your cell phone?

5   A.  This particular day I was actually on leave, so I did

6   have my cell phone that day.

7   Q.  And as I believe you already testified, you received a

8   voice mail on February fifth of this year from Mr. Gibson

9   saying that he was going to get another drug test, correct?

10  A.  That's correct.

11  Q.  You were also informed by your secretary that Mr. Gibson

12  called and permission, basically an okay, was told to Mr.

13  Gibson when he called and said he was going for a drug

14  screen.

15  A.  No, ma'am.

16  Q.  So is it true that is violation number two with regard to

17  being around an individual with drugs, that that is based

18  solely on violation number one?  Your allegation that Mr.

19  Gibson tested positive for cocaine in violation number one is

20  the basis for why you say he was around someone with drugs in

21  violation number two?

22  A.  Partly.  And if I may, I'd like to explain that.

23  Q.  How else could he have been in contact with someone else

24  that's not alleged in your report?

25  A.  Correct.  Mr. Gibson was on home incarceration.  So

1    unless someone brought him the drugs, or in his leaving and

2    going back and forth for scheduled appointments, he made

3    contact with someone with drugs, then he would have -- that's

4    how he would have had to get it unless, once again, he found

5    an old stash or old something around his house.

6    Q.   Okay.  That I understand.  But what I'm asking is if, for

7    example, in violation number two, are you saying the reason

8    you know that he was involved with someone with drugs is

9    because he tested positive?

10   A.   That's my opinion.

11   Q.   Yes.  So would you also agree if the Court finds that the

12   defendant is not in violation of number one, the fact that he

13   did test positive and had the substance in his system, you

14   would agree that violation number two would kind of go

15   away?

16   A.   Yes, ma'am.  I'm not the judge, so I wouldn't make that

17   determination.  My opinion is whatever I put on the report.

18   Q.   But as far as your basis for violation number two.

19   A.   Yes, ma'am.

20   Q.   And how much contact did you actually have with Mr.

21   Gibson?

22   A.   Mr. Gibson tried to make contact with him on a monthly

23   basis.  Mr. Gibson was reporting to the office on a weekly

24   basis, seeing other officers.  I'm in the Montgomery office,

25   so I'm not able to get to all of the counties every day.

1    Q.   And Mr. Gibson began his pretrial release in April of two

2    thousand seven?

3    A.   That's correct.

4    Q.   So from April two thousand seven to July two thousand

5    seven, for four months there were no problems.   Mr. Gibson

6    hadn't tested positive for anything.

7    A.   Correct.

8    Q.   And from October two thousand seven when Mr. Gibson got

9    out of the Fellowship House from October oh seven to February

10   two thousand eight, was Mr. Gibson continually tested during

11   that period of time?

12   A.   That's correct.

13   Q.   And there were no positive tests for that four month

14   period from October of two thousand seven to February two

15   thousand eight?

16   A.   That's correct.

17   Q.   And obviously that time period, again, October two

18   thousand seven and February of two thousand eight,

19   encompasses a lot of celebration holidays like Christmas and

20   New Year's.

21   A.   That's correct, and a tragedy.

22   Q.   And the passing of his mother.

23   A.   Correct.

24   Q.   And, again, he was clean during that entire period of

25   time?

```
 1   A.   Yes, ma'am.

 2   Q.   In fact, he was actually being tested almost twice a week

 3   because he was on the color code system when he came out of

 4   Fellowship House.

 5   A.   That's correct.

 6            MS. McKEE:  I don't have any further questions.

 7            THE COURT:  Redirect?

 8            MR. SHEPHERD:  No, Your Honor.

 9            THE COURT:  You may step down.  Thank you.

10            (Whereupon the witness, Bernard Ross, stepped down

11   from the stand.)

12            THE COURT:  Any other witnesses for the Government?

13            MR. SHEPHERD:  Not from the Government, Your Honor.

14            THE COURT:  Any witnesses for the defendant?

15            MS. McKEE:  Just briefly, Your Honor, I'd like to

16   call Mr. Johns.

17            THE COURT:  Okay.  Come forward.

18                    B U D D Y    J O H N S,

19      the witness herein, having first been duly sworn or

20   affirmed to tell the truth, was examined and testified as

21   follows:

22                    DIRECT EXAMINATION

23               BY MS. McKEE OF BUDDY JOHNS:

24   Q.   Mr. Johns, do you recall the date of February fifth, two

25   thousand eight when Mr. Gibson came into the Dothan office
```

1  with you and Mr. Pitcher?

2  A.  Yes, I remember the day.

3  Q.  And prior to that date, do you recall an instance where

4  you actually stated to Mr. Gibson that the cups used to take

5  a specimen are reused by the Probation Office?

6  A.  No, I never told him that in a serious manner.  I don't

7  recall any conversation.

8  Q.  Okay.  What I need to know is, did those words come out

9  of your mouth at any point while Mr. Gibson was on pretrial

10  release on that day when he came into your office and

11  specifically asked, "Are the cups reused?"  And you told him,

12  yes, we reuse the cups?

13  A.  I don't remember that.  I have been asked that before.

14  If I answered anything close to yes, it was a sarcastic

15  answer to a stupid question.  We do not reuse cups.  We

16  literally have hundreds of bottles in the back we use as

17  cups.  We never reuse cups.  Mr. Gibson always took the cup.

18  Once I handed the cup to any offender and they test it, I

19  tell them to set it on the back of the toilet.  I never touch

20  the cup again.  We do the dip test, they pour the urine in

21  the toilet, they flush it and they throw the cup in the trash

22  can.

23  Q.  And while that might be what typically happens, you were

24  not actually present on February fifth, two thousand eight

25  when Mr. Gibson gave the specimen to Mr. Pitcher?

1   A.  I was in the office, I wasn't in the bathroom.

2   Q.  That's what I'm asking.  You weren't in the restroom with

3   him, correct?

4   A.  No, I wasn't in the bathroom.

5   Q.  So you can't really say what procedure was used between

6   Mr. Pitcher and Mr. Gibson on February fifth, two thousand

7   eight, other than what generally you would do, correct?

8   A.  Well, I don't know that -- I didn't start talking to Mr.

9   Gibson until after him and Mr. Pitcher were at the end of the

10  hall and Mr. Pitcher was getting the form out that would send

11  the sample out for a confirmation.

12  Q.  So, again, so you would not know what actually took

13  place, how the specimen was given on this date, February

14  fifth, two thousand eight?

15  A.  Well I know one thing, it wasn't a recycled cup because

16  we do not have recycled cups.  We only have new cups.  Used

17  cups go in the trash, and the housekeeping service empties

18  the trash and they're gone.  The empties the trash and

19  they're gone.

20  Q.  Let me ask you, you say you don't remember telling Mr.

21  Gibson before February fifth.  Do you remember on that day,

22  February fifth, Mr. Gibson asking you at that point, Mr.

23  Johns, "I thought you told me that the Probation Office

24  reuses the cups."  And he stated that in front of Mr.

25  Pitcher, did he not?

1  A.  He did.  He stated that and I said if I said that it was

2  in a joking manner.  It certainly wasn't in a serious manner,

3  because we never recycle cups.

4  Q.  Would an individual who doesn't work at the Probation

5  Office who is not as familiar with the screening process and

6  all of the procedures and policies, would a regular person

7  who doesn't work at the Probation Office know that when you

8  say yes we reuse cups, that that's absurd?

9  A.  My opinion?  Anybody with a working brain would know that

10  we don't reuse cups.  They don't reuse them at doctors'

11  offices, and we certainly don't reuse them at the Probation

12  Office.  Mr. Gibson, every cup that he ever used, he

13  personally put in the trash can.  The test that I took from

14  him, he personally put them in the trash can.  Everybody

15  knows that.  Once it has urine in it, I don't touch it any

16  more.

17  Q.  Would you disagree if Mr. Gibson says that on February

18  fifth, two thousand eight when he was originally handed the

19  cup, there was no seal on the cup when it was given to him?

20  A.  I didn't see the cup.  I don't know.

21          MS. McKEE:  Nothing further.

22          THE COURT:  Anything further for this witness?

23          MR. SHEPHERD:  Not from the Government, Your Honor.

24          THE COURT:  You may step down.  Thank you.

25          (Whereupon the witness, Buddy Johns, stepped down

1    from the stand.)

2            THE COURT:  Any other witnesses for the defendant?

3            MS. McKEE:  Just Johnny Johnson.

4                         J O H N N Y    J O H N S O N,

5      the witness herein, having first been duly sworn or

6    affirmed to tell the truth, was examined and testified as

7    follows:

8                          DIRECT EXAMINATION

9                    BY MS. McKEE OF JOHNNY JOHNSON:

10   Q.  Mr. Johnson, if you would please state your name for the

11   Court.

12   A.  Johnny Johnson.  J-o-h-n-s-o-n.

13   Q.  And, Mr. Johnson, you're an investigator with the Federal

14   Defenders Office, correct?

15   A.  I am.

16   Q.  And how, if any, have you been involved in the case of

17   James Gibson?

18   A.  I have went and retrieved documents and interviewed

19   witnesses.

20   Q.  Specifically with regard to retrieving any documents in

21   this case, did you go to a service or a business named Health

22   Link?

23   A.  That's correct.

24   Q.  And could you inform the Court what type of business

25   Health Link is?

1  A.  Health Link is a laboratory that does various tests of

2  body fluids.

3  Q.  And when you went to Health Link, was health Link at all

4  familiar with James Gibson?

5  A.  Yes.

6  Q.  And how were you able to understand that they knew Mr.

7  Gibson?

8  A.  Yes.  I spoke with a Mr. Scott there who had performed

9  the test requested by Mr. Gibson.

10  Q.  And are you referring to a drug test?

11  A.  Yes.

12  Q.  And did you get the results of that test?

13  A.  I did.

14          MS. McKEE:  If I may I approach, Your Honor?

15          THE COURT:  You may.

16  Q.  Mr. Johnson, do you recognize what I'm showing you?

17  A.  Yes, ma'am.

18  Q.  Does it accurately reflect the document that you saw?

19          (Inaudible)

20  A.  Yes, ma'am.

21  Q.  Mr. johnson, what is this document --

22          (Inaudible)

23  A.  It's the result of a urinalysis performed on Mr. James

24  Gibson from an official at Health Link.

25          MS. McKEE:  Your Honor, at this time the Defense

1    moves to admit defendant's exhibit one.

2              THE COURT:  Any objection?

3              MR. SHEPHERD:  No objection, Your Honor.

4              THE COURT:  It's admitted.

5    Q.  Mr. Johnson, in obtaining the result of that from Health

6    Link, were there any results as a positive or a negative with

7    regard to this drug screening test done on Mr. Gibson done by

8    Health Link?

9    A.  Yes.

10   Q.  And what was that result?

11   A.  The drug that was tested for in the urine was negative.

12             MS. McKEE:  We have no further questions at this

13   time.

14             THE COURT:  Thank you.

15             Cross examination?

16             MR. SHEPHERD:  Yes, Your Honor.

17                        CROSS EXAMINATION

18                 BY MR. SHEPHERD OF JOHNNY JOHNSON:

19   Q.  Mr. Johnson, Do the results of the test also have the

20   words for the specimen "appears diluted" on it, correct?

21   A.  That's correct.

22   Q.  You weren't present for any of the testing in this

23   case?

24   A.  No, sir, I was not.

25   Q.  And none of the probation officers were present for any

1    of the testing that led to these results, is that correct?

2    A.  I don't know the answer to that, sir.

3    Q.  Are you aware of anybody who was present or who was

4    present for this test?

5    A.  I wouldn't know.  I wasn't there.

6    Q.  Or of any of the procedures that were followed during

7    that test?

8    A.  I don't know.

9              MR. SHEPHERD:  No further questions, Your Honor.

10             THE COURT:  All right.  Anything further for this

11   witness?

12             MS. McKEE:  Just briefly.

13                    REDIRECT EXAMINATION

14             BY MS. McKEE OF JOHNNY JOHNSON:

15   Q.  Mr. Johnson, are you aware of anything else -- Were you

16   notified when you went to Health Link that they do anything

17   other than they are a lab that tests for drugs, like drug

18   screens?

19   A.  Well, I'm assuming that they do other type of tests.

20   Blood tests for D. N. A. type tests and that of type thing.

21   Q.  But this is an official laboratory that does that type

22   testing with specimens from individuals?

23   A.  Oh, yes.  Yes.

24             MS. McKEE:  We have no further questions.

25             THE COURT:  All right.  Anything else?

1          MR. SHEPHERD:  No, Your Honor.

2          THE COURT:  All right.  You may step down.  Thank

3     you.

4          (Whereupon the witness, Johnny Johnson, stepped

5     down from the stand.)

6          THE COURT:  Any other witnesses for the defendant?

7          MS. McKEE:  No further witnesses.

8          THE COURT:  Any rebuttal for the Government?

9          MR. SHEPHERD:  No, Your Honor.

10          THE COURT:  Okay.  Any argument?  You don't have

11     do, I'm just giving you a chance.

12          MR. SHEPHERD:  Your Honor, the Government would

13     only say that the testing procedures that were described by

14     the witnesses from the Probation Office, by Officer Pitcher,

15     were followed in this case according to the procedures of

16     their office.  The sample that was taken, and the sample from

17     the central lab, the numbers match on the sample paperwork,

18     and the lab test results was showing a positive test for

19     cocaine.

20          We believe that is clear and convincing evidence,

21     and that no evidence to the contrary has been shown to

22     dispute the procedures that Mr. Pitcher followed in this

23     case.  The test that the defendant has admitted, we have no

24     evidence as to the procedures that were taken, no evidence as

25     to the manner in which the test was taken, and no evidence as

1   to anything about this case, other than a lab report that

2   says "negative", but also says the specimen appears diluted.

3           The purpose of testing by Probation for an

4   effective testing program by probation officers requires that

5   they be in charge of the testing, not the defendant.  In this

6   case, we would submit that the test provided by the probation

7   officers deserve far more credibility than any test submitted

8   on his own by the defendant, and that Mr. Ross's testimony is

9   credible, that he did not give permission for the defendant

10  to leave the premises on February fifth, other than to go to

11  the Probation Office and that's all.

12          THE COURT:  Anything from the defendant?

13          MS. McKEE:  In defense, Your Honor, with regard to

14  violation number two, that is based solely on violation

15  number one, as Mr. Ross has already stated.  That if for some

16  reason that the Court does find that violation number one the

17  defendant was not in violation --

18          THE COURT:  I understand.

19          MS. McKEE:  With regard to violation number three,

20  the permission, Mr. Ross has stated that if Mr. Gibson had

21  been lucky enough to get him on the phone rather than his

22  secretary, then he still would not have given Mr. Gibson

23  permission to go and take a second test.  At that point Mr.

24  Ross, nor ourselves in this Court, would have been able to

25  know the procedures of the testing if Mr. Ross gave him

1    permission.

2         I understand Mr. Shepherd is stating that the

3    probation officers' drug screens should be given more weight,

4    but there's been testimony from Mr. Gibson's very own

5    probation officer that has stated he would have given Mr.

6    Gibson permission to go, which in my opinion would have led

7    me to believe that he would have considered it, considered

8    any result that Mr. Gibson would have brought back from a

9    drug screen.  That Mr. Ross would have given him permission

10   to go and obtain on his own a test to try to show that he was

11   not actually positive for cocaine or any other substance.

12        Your Honor, we present to the Court in speaking

13   with Mr. Gibson's -- Mr. Gibson's wife is here.  And I

14   proffer testimony that if she was to testify before the Court

15   today, she would inform the Court that prior to February

16   fifth, two thousand eight there are two children in the home.

17   The children were becoming very ill beginning January

18   twenty-ninth that required them to seek medical attention for

19   the next week and-a-half, up to two weeks.  This sickness

20   went through the entire household, including Mr. Gibson,

21   which at the time caused him to be dehydrated, which, again,

22   coincides with my question to Mr. Pitcher of how much of a

23   specimen sample was Mr. Gibson able to give you that day.

24   And he testified that it was a minimal amount.  I believe he

25   said less than half.

```
 1              To explain at any point the result from Health Link
 2   as being described as "diluted," the Court asked Mr. Ross
 3   what his definition or what that would mean to him, that it's
 4   diluted, and he said that the person had overhydrated
 5   themselves.  Well Mr. Gibson, after just giving a specimen
 6   that was less than half of a cup for Mr. Pitcher in Dothan,
 7   he immediately left their office and went to Health Link.
 8   And in the meantime he was drinking Mountain Dew in an
 9   attempt he to give another specimen because he did
10   immediately, based on the Court's knowledge of the first
11   mishap, the first test that was done and of a retest that Mr.
12   Gibson had attempted to do to prove to the Court.
13              But with regard to this case here, Mr. Gibson's
14   diluted sample is simply that.  It still gave a negative
15   result when it tested for any drugs in the specimen that was
16   given.  It was a negative.  It simply was just diluted
17   because of the amount of liquids that Mr. Gibson was
18   attempting to retain in his body to give an adequate sample.
19              And, Your Honor, we do have the doctor's excuses
20   present in court if the Court would like to see those.
21              THE COURT:  Thank you.
22              MS. McKEE:  Your Honor, at this time, based on the
23   fact that Mr. Gibson was clean from the points of April two
24   thousand seven to July two thousand seven, from July --
25   excuse me from October oh seven to February oh eight, even to
```

1   the point in dealing with the stresses of Christmas, New

2   Year's Eve and including the passing of his mother, he

3   remained clean.

4           The minute Mr. Gibson was told that he possibly had

5   a positive indication of a substance in his system, right

6   then he made every attempt possible.  He asked for another

7   test.  He called and left a message on Mr. Ross's voice mail.

8   He also contacted the secretary.  He got the results back

9   from that test and came back to provide them to the Probation

10  Office.  And for this reason we assert to the Court that Mr.

11  Gibson has not violated in violation number one, two and

12  three as alleged in the petition.

13          THE COURT:  Thank you very much, Counsel.

14          Mr. Gibson, I do find you guilty of violations one

15  and three as charged, and number two as to the instruction to

16  refrain from illegal drug use.  I do not find you guilty with

17  regard to associating with individuals engaged in criminal

18  activity.

19          It's apparent from the testimony you could have so

20  associated prior to your arrest, and may have had something

21  left in the house, so I don't think the proof is sufficient

22  there.

23          But based on the other violations that I found, I

24  will revoke your pretrial release, and I will remand you to

25  the custody of the United States marshal.

1              (Whereupon, the proceedings were concluded.)

2                     * * * * * * * *

3

4              COURT REPORTER'S CERTIFICATE

5

6

7      I certify that the foregoing is a correct

8  transcript from the record of proceedings in the

9  above-entitled matter as prepared by me to the best of

10  my ability.

11

12      I further certify that I am not related to any of

13  the parties hereto, nor their counsel, and I have no

14  interest in the outcome of said cause.

15

16      Dated this 5th day of June 2008.

17

18

19               \s\ Mitchell P. Reisner, CM, CRR
**MITCHELL P. REISNER, CM, CRR**
Official US Dist. Court Reporter

20               Registered Professional Reporter
Certified  Real-Time  Reporter

21

22

23

24

25